The next case this morning is 20-4024, Estate of Madison Jody Jensen v. Clyde. Counsel, please prepare to argue. Thank you, judges. I would like to, this is Frank Myler, and I represent Janet Clyde, who's a licensed practical nurse from Duchesne County. I would like to reserve five minutes for rebuttal. This case is here because the district court completely failed to address the second prong of qualified immunity in any fashion whatsoever. The brief facts of this case is that there was an alleged heroin withdrawal in a rural county jail, and there was documented vomiting, but no blood was ever observed by anyone. There's no dispute on that. There is a claim, though, that Janet Clyde was looking for that and never heard that issue. Jensen, however, adamantly denied that she was ever withdrawing and said it was basically the stomach flu and that she was vomiting from. Nobody, including Clyde, the sheriff, any of the officers, and even Dr. Tubbs had ever experienced a death from heroin withdrawal or dehydration in a jail or prison. It was just not something that was known to be dangerous at that time. Mr. Myler, I need to address an issue that I don't recall seeing in the briefs but is really troubling me, which relates to the question of jurisdiction. I mean, the district court's order here did, frankly, what it should not have done, as I view it, which is focus on the question of genuine disputes of material fact, and it did not focus on the question of what is the abstract legal application to a defined universe of facts, which are plaintiff's version of the facts as supported by the record. So what I need to get clear, because I'm not clear from your brief, is are you operating on plaintiff's version of the facts as supported by the record? Because if you're not, then there's a problem because there's a jurisdictional problem as it relates to whether we can hear this case now. No, I believe under both versions we should win this. Well, you've only got one version here that's going to matter, okay? I appreciate that. You're telling me here that you're going to take plaintiff's version of the facts because we're going to have to figure out what that is as supported by the record. Absolutely, absolutely, because the issue here is very clear. There was vomiting, you know, we'll accept those facts as to what Jana Clyde was communicating to her. We absolutely accept those facts offered by the plaintiff, but what's significant here is that the district court only relied on the general notion that, which is not the second prong, it's the first prong, whether there was a constitutional violation. He said there was a dispute of fact as to whether the subjective component of deliberate indifference was met. That did not address the issue of the second prong. Now, White v. Pauley, the U.S. Supreme Court, clarified this very clearly in 2017, and it ruled it must be the particularized facts of the case. That was never done. No cases were looked at. The plaintiff never showed any cases that were anywhere similar to a heroin withdrawal or a stomach flu type of case. Pauley further said, I think this is very important, Pauley further said, and this was actually a Tenth Circuit panel, it said the panel majority misunderstood the clearly established analysis. This is the same thing that the district court misunderstood, because it failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment. The question is whether in this case in 2016, whether it concludes there was a case that includes that Clyde's particular acts were clearly unconstitutional beyond debate. In fact, as Pauley says, it has to be in light of pre-existing law. The unlawfulness must be apparent, and they're citing prior Supreme Court cases. Interesting, Pauley is pointing out that this is a common problem. They're actually pointing out that that courts are not getting this analysis into whether there's similar cases going on out there. There is a common problem, but Taylor versus Rios, which is the Supreme Court case, we resurrected and made clear that we can still look at extraordinary facts and determine that any reasonable government official, given those circumstances, should have known that something was a constitutional violation. And so if your client receives a note on Tuesday that says, I've been throwing up for four days and I cannot even hold down water, why isn't that an extraordinary set of facts that should have let you know that she was in need of emergent care? I appreciate that. Yes. In fact, the reason that note was even authored was not because Madison Jensen requested medical care whatsoever. It was because my client said, we need to get her on the doctor's list for Thursday. She needs to fill this out. She got her the note. Richens took it to her for that very purpose. And I don't think that helps you. So what? I mean, the point is she relayed what the circumstances are, and it seems to me that's a red herring. If she's coming in, she's definitely sick to begin with. Why is the onus on her necessarily to say, oh, well, you know, I need help. Well, if she loses, I don't know how many pounds, she lost a number of pounds while she was in there. She looked like a skeleton. What? I mean, so she's so sick, she can't respond. She's on the floor. So the point I'm making is irrespective of who asked her to do the note, the note communicated facts, which why would not a reasonable person who was acting as a gatekeeper in that situation, like she can't, she needs help now. Tuesday, I have not, can't even hold down water for four days. First of all, in the case law, which I think is very important, the case law shows, and even the cases that were just decided, the Quintana case that we just cited had worse facts. And actually, just the recent supplemental authority that we did in strain versus legato actually had worse facts from 2015 and 2016, which is relevant to this. The nurse in strain knew of vomiting, severe tremors, acute panic states, disorientation, the delirium tremens. Yes, the nurse in strain was consistently trying to intervene, maybe, and in strain, it was framed as a misdiagnosis, misunderstanding of what she needed. In this situation, why isn't this more akin to, I guess, MATA, where somebody's having a heart with MATA, because MATA, the only nurse that was found liable, was the one that said, nope, I can't help you, come back tomorrow. She never did that. In fact, she was brought to medical Monday, she evaluated her, and she did vitals. She was brought the next day, but on Monday, she also offered her the same thing as like a kit kit. She offered her all these drugs that she could take that would help her. She may have lived if she had taken some of those drugs, because they would have helped the upset stomach. They might have limited the vomiting and diarrhea, but she refused those drugs that she offered to her on Monday and Tuesday. Now, on Wednesday... What drugs are you talking about? I don't recall that fact, and where is it in the record? That's an undisputed fact, that Janna Clyde, when she met with her on Monday, offered her, she showed her a bunch of medications, over-the-counter medications, that typically help people that are withdrawing or have an upset stomach. She basically, Janna Clyde, treated it both ways, but she didn't, she had always known that people that were withdrawing or had an upset stomach, had a rough few days, but then they came out better, and that was what her understanding was. She can't hold down anything, and as we know, dehydration was a central factor here. If she can't hold down anything, and what I'm trying to grapple with, and I find telling, is constantly lay people kept going to Ms. Clyde, saying there's a problem, she seems to be really sick, and as far as they're concerned, they discharged their obligation when they went to Ms. Clyde, because Ms. Clyde was supposed to be the gatekeeper, and said she's really sick. Well, why, given those repeated entreaties, would she not have an obligation to do something? First of all, not all of the information stated by plaintiffs, is actually information that Janna Clyde knew. And here, I want to be clear, this is the plaintiff's version of the facts, as accepted by the record. So, if they've got record evidence to support their allegations, and what the facts are, you're stuck with them. I agree, but there was no evidence that anything that happened on Wednesday night, when she was vomiting all those times, and it was ever transmitted to Janna Clyde. Thursday morning, she came in, and an officer came to her and said, she's sick, can I give her a Gatorade? She's really sick, can I give her a Gatorade? Now, she said yes. Every day, she let her have Gatorades. When she went to her cell personally, on Wednesday, she handed her a Gatorade, undisputed evidence, she got up from her bed to receive it from the door, and she asked how she was. At that time, she was able to walk. The issue about her coming back from the medical, and hardly being able to walk, Janna Clyde wouldn't have been able to see that. I mean, she says, that's in the record, that Richens took her back, and she had hard time walking, but how in the world is Janna Clyde ever going to see her walking back, when she's not there? I don't remember, I don't remember the officer now, but there was one officer who broke protocol, and went into her cell to give her, I think, give her Gatorade, because she couldn't get up. Now, she was, that officer reported that event to Clyde, is at least my recollection of the facts. Given that, and I'm still stuck on this, on this, the her self-reporting on Tuesday, that she can't hold down water. Now, given that circumstance, why wasn't there a need to do something? I mean, I don't care who asked to fill out the report, she gave the report, and the report says, I can't hold down water, and I note your brief makes this statement about, oh, she was confused about the doesn't make. If she wasn't holding down water two days before she went to the jail, and then wasn't holding down water two days in the jail, it's still four days. Well, she had treated her just on Tuesday, and she was, and she was not exhibiting those kinds of difficulties, when she saw her in the clinic on Tuesday. As far as she knows, she walked to and from the clinic on her own. That was all the information that is actually given to Janna Clyde at that point, and she, and her, actually the vitals, I think, were normal on Tuesday, and so she had taken vitals on Tuesday, and they were normal, and so what you have here is, no, I'm not saying this is the best of all health. I think that this is a person trying to do what she can, never having experienced any severe trauma from this condition. Always they got better. I mean, I have to tell you, they always got better. They had a rough few days, but she, unlike Mada, the nurse did nothing, literally nothing in Mada, but she, just like Strain, and just like Quintana, she took action, but she actually took more action than they did, because she, she saw more action than, than Strain. I mean, all she did was give Gatorade to her. Strain intervened at multiple points along the line. Yes, she did too. She, she saw her, looked on her twice, at least on the video, and from the control room, to see how she was doing. She went personally to her cell on Wednesday before she left. She authorized the Gatorade every day, Monday, Tuesday, Wednesday, and Thursday. She also put him on the list to see the doctor, and brought the doctor, the PA, to her cell. As the last stop on the trip. Now, how does that make sense? I mean, how would a reasonable person do that, given the consistent reports of her, of her illness, that you would, if, if nothing else, let's view that as the decision point. If no other point was the decision point, here's the PA. What do I do with him? Oh, well, I'll bring him to her as the last thing on the list. Why isn't that deliberate indifference? Because that is the, that was the, the way the PA did it. He never went to the booking first. He always went last to the booking, because they would have to bring the inmates to them in the other areas, and that was the practice. So, if she was having a heart attack, you would still say, oh, well, you know, let's just wait, and we'll bring the, we'll bring a PA to her at the end of the day, right? That's, that's a perfect example. She wasn't having a heart attack. Chest pains are way worse, and yet, in MATA and in C-LOC, there were chest pains that were not reported, but there was some action actually taken, and so, in this instance, she is exonerated, because she took action. Is it the best action? Probably not. That's not the bar, though, is it? I mean, you're not telling me that the only, that the issue is whether you take action or not take action. I mean, there's some action that, again, the antacid relative to the heart attack, there's some action that is just wholly insufficient, isn't it? No, because heart pain is way worse. Oh, you're saying that if you take any action, that you're excused from liability? No, not all, no, of course not, but, but I think that action is the key when looking at the facts of the case. I would like to reserve a little bit for rebundal, if that pleases the court, but I don't want to cut you off. I'm done. Thank you. I have a question for you before you start, counsel. How on earth did you get ourselves, yourself into the virtual courtroom, facing the right direction, though, to us? I followed your wonderful clerk's advice, and I downloaded the skin off of the website. May it please the court. My name is Ryan Hansey, and I represent the appellee here, the estate of Madison Jensen. And as Judge Holmes pointed out at the very beginning, the estate is entitled to its facts and the inferences that are reasonably drawn from those facts on this appeal. And there were some, I think, misstatements about those facts that I want to clear up right now. This is the timeline, and this is what the universe of facts in the estate's favor show. First of all, Nurse Clyde testified that she knew symptoms like Madison's would create a risk of dehydration. So that's the knowledge that she has going in. On Monday, she gets there for the first time. Madison had checked in on Sunday, and she had vomited throughout the night. On Monday morning, Madison is brought down to Nurse Clyde's office. And Nurse Clyde hears Madison complain about vomiting, about being unable to keep down food and water, and about soiling her sheets. Nurse Clyde noticed that Madison was weak, and sick, and very thin, and looked like a walking skeleton. She also learned on Monday morning that Madison was withdrawing from heroin. She learned that because one of the jail officers reported the tests, the results of her drug test that she took when she entered the jail. There is evidence on that evidence that Nurse Clyde believed Madison was lying about being on drugs, and that she perhaps withheld care from that point on because of that. On Tuesday morning, Officer Richens noted that Madison's condition had deteriorated dramatically. She brought her back down to Nurse Clyde's office, and they were all three together in the office, observing that she had changed quite a bit from the day before. She was now looking terrible, and everything that happened that they had observed before was the same, but now she was moving really slowly as though she was going to pass out. She was still throwing up consistently. She would hold onto the wall for balance. She leaned up against the sink in the medical office. She was still unable to keep down food or liquids. She felt dizzy. She had diarrhea, and she was refusing meals. Okay, this is what she's had. This is her circumstance. Did she report these things to Nurse Clyde, I mean, on that Tuesday in that conference? It's one of two categories, Judge Holmes. Either she reported one of those things that I just said, or Officer Richens observed it at the medical room meeting, and the inference is that Nurse Clyde, with more medical training than Officer Richens, had observed the same. Oh, well, no, I don't think that, oh, so that seems to me to be a stretch. So you're saying just because Richens observes it, you're saying that, by definition, Clyde observes it. I think we're in a situation where we're relying on what either, all right, fine. If that's an inference you want to go with, it seems to me that that's pretty tenuous, but go ahead. Fair enough. The things that Madison actually reported that day are that she was still vomiting, and she leaned up against the sink in the medical room and in her room, and she started vomiting very slowly. Richens, later that day, she was taken back to her cell. Officer Richens noticed that she was looking bad, and she got concerned about that. So she asked Nurse Clyde, can I move Madison to a medical observation cell? This is a cell that's specifically designed for keeping a close eye on people. Nurse Clyde approved the request. Nurse Richens, later that day, tells Nurse Clyde that Madison is still vomiting. She's still weak. She's still dizzy. She's still having a hard time walking. And so Nurse Clyde says, have her fill out a medical request form, which, by the way, was a prerequisite of this jail to seeing a doctor. So Officer Richens takes the medical request form down to the cell, and Madison fills it out. She, as Judge Holmes pointed out, self-reported that she had been vomiting and had diarrhea for four days straight and couldn't hold anything down, not even water. Those are her words. Richens gave the completed form back to Nurse Clyde. Clyde, what does she do in response? She does nothing. She doesn't go down and take her vitals. She doesn't go down and check on her on Tuesday. She doesn't contact the doctor, and she doesn't do anything else. And I just want to clarify something that Mr. Mylar said. I don't think the Monday night call to Logan Clark has any bearing on what happened on Tuesday and beyond, but there is a dispute as to what took place in that call. Logan Clark testified that the only thing that Nurse Clyde brought up in that call was, can she have this prescription? Didn't even mention her by name. Certainly didn't mention anything about the fact she had been vomiting. That is a disputed fact. Now we're into Wednesday, and on Wednesday, Nurse Clyde stops by Madison's cell for a minute, but she doesn't ask her about her symptoms. And that's something that the judge below found, is that she doesn't even take the time to follow up and ask Madison about the symptoms that she had reported in her medical request form the day prior. She doesn't take her vitals. Wednesday night, before Nurse Clyde leaves for the day, Officer Kayla Bird goes to her cell to give her her prescribed medication. Notices that she's too sick and weak to get up off of her bed to come to the door to get it, so he violates protocol, enters her cell, hands her the medication, notices there's green he leaves and goes down and passes the nurse's office and has a conversation with her. And there's a dispute about what he says, but... What does he say he says? I mean, we're taking your version as supported by the facts. What does he say he says? He says that she was vomiting and too weak to get out of bed. That's what he says he reported to Clyde? That's right. And Nurse Clyde told Bird in response, I know she's vomiting, she's withdrawing from heroin. That's a version of the facts that's on the record for Wednesday night. Clyde still does nothing. She goes home for the day. Now, Thursday morning comes, and this is the weekly visit where the doctor comes. He comes once a week, the PA I should say, and he doesn't vary from that routine apparently, but the jail practice is that when the nurse Clyde will collect the medical request forms filled out by the various inmates for that week, collect them together, attach them to a file for each inmate, and then as soon as the PA gets there in the morning, she'll hand him the files. He can go through them and apparently decide what he wants to do, and then he sees the inmates one by one. There's a dispute, but the estate is entitled to the factual pattern that when PA Clark arrived on Thursday morning, Nurse Clyde did not give him Madison's medical request form. He didn't know about what she had said. He didn't know that she was sick. Does he say he got the form? He didn't get the form. He never saw it before. He's never seen it is what he testified. Nurse Clyde says I did give it to him, but Logan Clark says otherwise. Logan Clark says I never saw it. The inference there is that she lost the form or she was withholding it. I don't know what she was doing, but she certainly didn't follow her normal practice, and so what does Logan Clark do? He looks at the files that he did receive and he proceeds to go visit those inmates and treat them, and then he's leaving for the day. He's leaving for the day, and as an afterthought, Nurse Clyde says oh hey there's a girl you might want to go look at, and they walk down to her cell and she's dead. She had died about an hour earlier. So that's the fact pattern. Those are the facts that the estate is entitled to on this record. That's helpful for me anyway, but given that, just give me a response though to strain. Why does strain suggest that Nurse Clyde should be relieved of liability here because I'll leave it at that. Respond please to that criminal authority. Well I think that the nurse in strain, that was a, if I remember right, that was a misdiagnosis case, and so the nurse took, I don't remember if it was an EKG, or it was some kind of a test, if I'm remembering the right case, and she gave a wrong diagnosis, and so based on her information to a doctor because she didn't think there was anything concerning, and Judge Holmes, if I'm getting that case wrong, please correct me, but I think that was the fact pattern. That is different here because here we have, it's not a misdiagnosis case, we have Madison self-reporting what was going on on Tuesday, and we have multiple officers coming and fulfilling their responsibility. I mean they got off the hook. The judge let them out on summary judgment because they fulfilled their limited obligation of reporting to Jana Clyde, even though they all, this is the line from strain. So as plain as factual allegations suggest, the defendant's diagnosis, Mr. Pratt, with a less severe case of alcohol withdrawal, and at least attempted to treat Mr. Pratt's symptoms. Now I take it that why Nurse Clyde provided this is to indicate here that she did try to do something, and since there had not, and it seems to me a fact that hurts you a lot, is that there never been anybody who died of dehydration in that facility, and they didn't know of anybody to die. And so under those circumstances, the point would be that yes, maybe they didn't anticipate that her dehydration was as great as it was, but they did something. They gave provided strain, and so what's your response to that? Very good, Your Honor. The giving of a Gatorade is the equivalent of cursory treatment. It's like giving an antacid, as this court has said in one of its cases, to a heart attack patient because, especially in light of one's down. It's like, it's a pointless exercise. It's like getting a medical request form that's telling you that there's a severe condition, and then doing nothing with it and saying, wait till Thursday. It's the same thing. It amounts essentially to inaction. What do we do with the stomach bug reference? I mean, apparently Nurse Clyde believed early on it was a stomach bug, and wouldn't that skew her sense of what the severity of Madison's condition was? I think that that could be an excuse on Monday morning when she was reporting flu-like symptoms, but not on Tuesday, not after Tuesday when she's moved to the medical observation cell. You've got multiple officers saying she's really, really bad, and she's saying that she can't keep food or liquids down. That's the time when she needed to step in and do something. I think a better analogous case is Quintana. Quintana came out, I think, in December of 2020. Quintana, I think, is illustrative because it involved an inmate who came in and was vomiting. I think there were a group of four officers who took turns. They were on shift during his stay there, but one of the four saw this inmate vomiting blood and didn't do anything with that information. This court stepped in and said, look, there's not another bloody vomit case, but kind of like, it didn't say Taylor v. Rios, but it's that same concept. It was an extraordinary set of facts. The fact that blood is in someone's vomit is so obvious of evidence of a risk of a severe medical condition that that guy should have known to report to somebody, and he didn't. That's indifference. Focusing on clearly established law, though, what's your theory? Is your theory to rely on this notion of extreme case, therefore I don't need a case? Or what's your closest case that would have clearly established the unlawfulness of this conduct in November, December 2016? I think that the obviousness is one route to get there. I do. Quintana is touching on that, but I think that the clearly established right here is the one that is discussed in Quintana, Seelock, and Mata. The cases say that prior to January of 2016, when a detainee has obvious and severe medical needs, it's a violation of the detainee's constitutional rights to ignore those needs. It necessarily violates it. Just like with the vomit in Quintana, a jury could conclude that the seriousness of the medical risks associated with being unable to keep down food and water for four days, coupled with the other symptoms of severe distress here, would be obvious to any reasonable observer. And so those are the cases, Your Honor. I think it's Seelock, Mata, Quintana that established that right, and it's been established since long before the events transpired here in this case. And so I think I'm running out of time, so I want to just wrap up and say that I believe that the judge below understood what happened here. He understood the law. He didn't articulate the clearly established prong as well as he could have, but he understood that the facts here, taken in the light most favorable to the estate, established deliberate indifference. And in fact, under the standard in the Quintana and those other cases, it was a violation of a clearly established right. So we ask the court to affirm. Thank you, Your Honor. First of all, dehydration and heroin withdrawal were not a known problem, and that is very important. Earlier, counsel was talking about Mata when you asked him about strain, but strain is important because of the serious problems like delirium tremens as well as the vomiting. But more importantly, I think, is Quintana. Quintana is the case on point that shows that the law was not clearly established because it ruled that it's not even meeting the objective level of the deliberate indifference just because there's severe vomiting. Well, what time, Quintana, what time frame were they capturing in that? 2016. It was 2016. Quintana was perfectly right on with this case. And so the judge didn't look at any cases to compare the particularized facts. Quintana does require reversal, absolutely, in this case, because she didn't just give Gatorade. She went to her cell the last thing. Counsel just said she didn't do anything, but she went to her cell the last thing on Wednesday and gave her a Gatorade. She got up and took it and sat down. We therefore ask you to reverse the decision. Are there any more questions at this point? No questions on my part. Colleagues, hearing the cases submitted, counsel are excused.